IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JAMES BOURN,

                          Plaintiff,                          OPINION AND ORDER

      v.
                                                              25-cv-128-wmc
JAKE BLUM and SAMANTHA CARESS,

                          Defendants.

Plaintiff James Bourn claims that Dunn County Sheriff's Deputies Jake Blum and Samantha Caress violated his Fourth Amendment rights in unlawfully arresting him using excessive force after a pole-shed fire started on his property.  Defendants have moved for summary judgment, arguing that the seizure and their use of force was reasonable under the circumstances, but even if not, they are entitled to qualified immunity.  (Dkt. #14.)  Because plaintiff has failed to identify any controlling law clearly establishing that defendants' actions violated the Fourth Amendment, the court agrees that defendants are entitled to qualified immunity and will enter summary judgment accordingly.

UNDISPUTED FACTS[1]

**A.  Background**

Plaintiff James Bourn, who is in his late 60s, is a long-time resident of Menomonie, the capital city of Dunn County, Wisconsin.  Defendants Samantha Caress and Jake Blum are deputies with the Dunn County Sheriff's Office.

---

[1] Unless otherwise indicated, the following facts are material and undisputed for purposes of summary judgment.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from the record evidence as appropriate, including the parties' depositions and Deputy Caress's dash-cam video footage.  While the court recounts the facts in the light most

On October 23, 2024, Deputy Caress was dispatched to plaintiff's residence after the report of a pole-shed fire.  Upon arriving at the residence about three minutes later (dash-cam video, dkt. #18-1, at 3:22), Caress observed heavy smoke coming from a garage and an attached pole shed, located approximately 11 feet from the nearest wall of plaintiff's house. After exiting her squad car, Caress told the bystanders closest to the residence to step away from the fire.  She then spoke with one bystander, David, who reported that there was a propane tank located near the pole shed, as well as freon tanks inside the shed itself.  Because Caress heard popping noises coming from inside the pole shed, she stepped further away from the fire herself.

At that time, plaintiff James Bourn stood approximately 15 feet from the fire and was spraying both his shed and house with a garden hose.  According to Bourn, he was able to slow the shed fire and protect his house from catching fire.  Plaintiff also testified that bystanders took steps to prevent further damage by moving his truck to a neighbor's house and grabbing fuel cans that plaintiff had removed from his garage when the fire started.  Plaintiff believed that he was standing at a safe distance from the fire, as he did not feel any heat or see the siding on the structure start melting until after he was allegedly assaulted by defendants.  A few times, Bourn also hollered at Caress to ask her when the fire department would show up.

Approximately four minutes after Deputy Caress arrived, two members of the Menomonie Fire Department dually certified as medics and fire personnel arrived by

---

favorable to plaintiff, *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022), some key facts are undisputed because even though Caress's squad was parked at some distance from the residence, her dash camera clearly captured a good portion of the parties' movements on video. *See Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (at summary judgment, court must view the facts in the light most favorable to the nonmovant," but should "rely on clear and conclusive videos if they 'firmly settle a factual issue.'") (citation omitted).

ambulance at the scene.[2]  Firefighter Zack Hartung declares under oath that upon his arrival in the ambulance, he instructed plaintiff Bourn to back up and get away from the fire (Hartung decl., dkt. #, at ¶ 5), but Bourn claims that no fire department or EMS personnel gave him any instructions before defendants restrained him (pltf.'s dep., dkt. #20, at 49).  Still, Hartung and the other firefighter on the scene assessed the fire and surrounding area for hazards.

Within about a minute of the ambulance arriving, Deputy Blum arrived out of uniform, explaining to Deputy Caress that he had been driving in the area when he observed the smoke and came to make sure the fire had been called in.  At that point, Blum observed that a three-stall garage with a pole shed attached was on fire and "was really going," and further that "absent the fire department getting there, there was no way to put that out."  (Blum Depo., dkt. #21, at 19.)  Deputy Caress also informed Blum that there was a 500-pound propane tank located about 11 feet from the back side of the garage, which itself contained flammable chemicals from refrigeration equipment, carburetor cleaners, parts washers, oils, and grease. Once started, the fire also began to spread through the roof of the garage and moved towards the house.

Deputy Blum then decided to stay on scene with Caress until another on-duty deputy arrived, but he stood away from plaintiff Bourn because he did not want to be the first point of contact between plaintiff and emergency services, as he was not in uniform.  When

---

[2] While Bourn testified at his deposition that the fire department arrived four to five minutes *after* Deputies Caress and Blum restrained him and moved him to a yard across the road from the fire (dkt. #20, at 53), the dash-cam footage plainly shows that these two fire persons (whom plaintiff may have mistaken as only EMTs) arrived at the residence in the ambulance much earlier -- only about four minutes after Deputy Caress arrived and *before* Deputy Blum arrived or any physical contact occurred between plaintiff and defendants.  (*Compare* dkt. #18-1, at 7:17 with *id*. at 8:16, 10:05 to 11:09, and 12:33.)  Consistent with this video footage is plaintiff's testimony that an EMT, whom the court can only infer was Hartung or the second firefighter in the ambulance, was present during the physical interaction with defendants.  (Dkt. #20, at 34.)

Firefighter Hartung returned from checking the property for hazards, Bourn was still spraying water on the garage and his residence using a garden hose. Hartung further declares that he instructed Bourn a second time to get away from the fire, and plaintiff briefly complied, but then had to tell him a third time to back away. However, plaintiff denies having received *any* of these three instructions to move away from Hartung.

Regardless, Hartung then motioned to Deputy Caress, who approached him for confirmation that plaintiff needed to be moved away from the fire for safety reasons. Caress also informed the firefighters about the liquid propane tank located behind the shed.

### B. Undisputed Interaction Between Plaintiff and Defendants[3]

At that point, Deputy Caress approached plaintiff and told him it was time to step back from the fire. When plaintiff failed to turn around or respond, Caress grasped his upper arm and/or shoulder to gain his attention.[4] Deputy Blum then also stepped in to assist Caress by grabbing plaintiff's shoulder and forearms. Plaintiff subsequently stiffened his arms, and during the struggle, the hose he was holding sprayed Blum in the face. At some point, Blum delivered one, half-strength knee strike to plaintiff's abdomen before Caress was able to remove the hose from plaintiff's hand, then Blum and plaintiff both fell to the ground.

---

[3] Although the parties dispute some of the details of what happened when defendants proceeded to try to get plaintiff away from the fire, the following facts are generally undisputed.

[4] Specifically, Caress testified that she told plaintiff: "Okay, it's time. We need to go." (Dkt. #19, at 28.) While plaintiff relies on his general deposition testimony that he was not given any verbal commands from the law enforcement officers (dkt. #20, at 54), he expressly testified that Caress approached him while he was spraying his house, grabbed his right shoulder, *and* told him that "It's not safe, get back." (Dkt. #20, at 25.)

While plaintiff was in a prone position on the ground, Blum knelt to plaintiff's left and attempted to free his left arm, which was tucked beneath his body. After Deputy Caress yelled "Sheriff's Office" and "stop resisting," Blum was able to free plaintiff's left arm. (Dkt. #19, at 30 and 70.) Next, Caress secured his left hand in a handcuff, then after freeing plaintiff's right hand from underneath his body, also placed his right hand in handcuffs. The deputies then rolled plaintiff to his side to get him in a seated position and asked if he would like to be evaluated by medical personnel, which he accepted only later at the scene.

When the deputies attempted to stand plaintiff up to move him away from the fire, plaintiff claimed that his legs did not work, so they each grabbed one of his arms and carried him away from the fire and across the road.[5] Once across the road, the deputies placed plaintiff in a seated position and asked again him if he would like to be examined by the EMTs on scene. Instead, plaintiff requested that the handcuffs be removed, which the deputies did within 30 seconds, but only after plaintiff agreed with Deputy Caress's request to calm down.

After sitting on the ground for a brief period, plaintiff stood up and began walking back and forth. Within about two minutes of the deputies seizing plaintiff, Deputy Steinkraus and a Menomonie Fire Department firetruck both arrived at plaintiff's residence (dkt. #18-1, at 12:33), and Caress and Blum left the scene as Steinkraus took over. The EMTs on scene then determined that plaintiff did not need to be transported to a hospital.

---

[5] Although plaintiff claims that defendants "threw" him into the yard next door (dkt. #20, at 27), the dash-cam footage clearly shows that plaintiff was moved steadily across the road to a stopping position and not thrown. (Dkt. #18-1, at 11:03 to 11:09.)

## C. Disputed Facts About Parties' Interaction

The parties' only material factual dispute about their interactions on October 23, 2024, concerns the amount of force, if any, that defendants used in bringing plaintiff to the ground and safely across the road.  Plaintiff claims that Deputy Blum did not identify himself, "forcefully" grabbed his forearms and/or wrists, and began "violently shaking" him (dkt. #20, at 25-26, 32, 57), despite the fact that he did not resist.  He further asserts that Blum:  was full of rage after he was sprayed in the face with the hose, attempted to knee plaintiff in the groin, but missed, and instead hit him in the stomach.  (*Id*. at 26, 61-62.)  While plaintiff claims not to remember how he went from standing to the ground, he claims to have woken up on the ground, with his shirt over his head, hyperventilating, and telling defendants that he couldn't breathe.[6]  (*Id*. at 26 and 53-54.)  Finally, plaintiff claims that he suffered several injuries, including soreness, bruises, and discoloring on his back, upper arms, and forehead. (Dkt. #20, at 58, 62.)

For their part, defendants claim that plaintiff "resisted" by pulling away from their grasp on his arms and/or shoulders and pushing Deputy Blum away with his free arm.  (Caress depo., dkt. #19, at 28-29 and 68; Blum Depo., dkt. #21, at 27-28 and 52-54.)  Blum further explains that he needed to gain control of the situation, because there was an active fire with a nearby liquid propane tank. (Dkt. #21, at 27.)  Therefore, after unsuccessfully trying to pull plaintiff

---

[6] While plaintiff testified that the defendants "apparently" had spun him around, pulled his shirt over his head, and slammed him to the ground left-shoulder and head-first, plaintiff has no personal knowledge that any such actions occurred, as he remembers only waking up on the ground with a handcuff on his left wrist. (Dkt. #20, at 25-26, 53-54.)  Plaintiff also testified that he is "absolutely positive" that Deputy Caress kneed him in the back, because he got a bruise on his back, but admits that he only assumed that this happened as well because Caress was on his left side where he later developed a bruise.  (*Id*., at 27, 38-39.)  Therefore, plaintiff's speculations about what must have happened fail to create a genuine issue of material fact about how plaintiff went from standing to the ground.

to the ground to get control of the situation, Blum delivered a knee strike to his abdomen, which took plaintiff to the ground.  (*Id.*)

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

Plaintiff contends that a reasonable jury could find that defendants used excessive force in restraining and handcuffing him, even though he had committed no violent or serious offense, did not resist or attempt to evade arrest, and posed no threat to defendants or anyone else on the scene.  He also asserts that defendants did not have probable cause to seize him for intentionally and knowingly interfering with firefighting in violation of Wis. Stat. § 941.12(1).  For their part, defendants contend that their actions did not violate the Fourth Amendment, and even if they did, both are entitled to qualified immunity.  The court will address qualified immunity first, as that issue is dipositive in this case.  *See Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 654-55 (7th Cir. 2024) (district court may resolve case on qualified immunity without addressing underlying constitutional violation).

Qualified immunity shields government officials from monetary liability unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  This doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.  "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

When a public official asserts qualified immunity at the summary judgment stage, the plaintiff has the burden of defeating it by showing that a defendant violated a clearly established statutory or constitutional right.  *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021).  To be clearly established, the right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle*, 114 F.4th at 655.  At this step, the United States Supreme Court has frequently cautioned against defining that right at too high a level of generality, rendering the defense of qualified immunity relatively meaningless. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  In particular, the Supreme Court has emphasized the importance of applying qualified immunity correctly in excessive force cases, an area of the law "in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam); *see also City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted).  Although plaintiff's complaint appears to assert only an excessive force claim under the Fourth Amendment (dkt. #1, at ¶¶ 1-2,

21, 25-27), both parties discuss the standard for false arrests as well, so the court separately addresses the parties' qualified immunity arguments with respect to both.

### I.  Excessive Force

Plaintiff's excessive force claim originates from the Fourth Amendment's protection against unreasonable seizures.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  An officer's use of force is analyzed under an objective reasonableness standard, which "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396.  Among other possible factors, an officer's use of force is judged by:  (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*.  The officer's action must also account for "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (citation omitted).

Law enforcement officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021).  To overcome qualified immunity in an excessive-force case, therefore, a plaintiff must either: (1) identify a closely analogous case that established a right to be free from the type of force the police officers used; or (2) show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. *Id*.

Here, plaintiff argues that it was clearly established law at the time of defendants' actions that "pushing, shoving, throwing, or 'man-handling' an arrestee would be deemed unreasonable when the arrestee has committed only minor offenses, poses no threat to safety, and is not resisting or evading arrest." (Dkt. #24, at 6-7 (citing *Payne v. Pauley*, 337 F.3d 767, 779-80 (7th Cir. 2003); *Tennen v. Shier*, No. 94-cv-2127, 1995 WL 398991, at *6 (N.D. Ill. June 30, 1995)); *see also id*. at 12-13 (citing *Dockery v. Blackburn*, 911 F.3d 458, 468 (7th Cir. 2018); *Morfin v. East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003); *Clash v. Beatty*, 77 F.3d 1045, 1047-48 (7th Cir. 1996); *Green v. Chvala*, No. 12-cv-761-wmc, 2015 WL 5918918, at *6 (W.D. Wis. Oct. 9, 2015); *Ingram v. Jones*, No. 95-cv-2631, 1995 WL 745849, at *11 (N.D. Ill. Nov. 29, 1995)).

However, even ignoring the presence of an objectively serious threat to safety, the general proposition that officers cannot use significant force on a non-resisting or passive individual is insufficiently specific to govern the outcome of this case.  Indeed, such a reading would run headlong into the Supreme Court's repeated warning "not to define clearly established law at too high a level of generality" for purposes of a qualified immunity analysis. *E.g., Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 2 (2021).  Similarly, the Seventh Circuit has specifically held that "framing the right" in the excessive force context "as the right to be free from force once subdued is impermissibly broad." *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024); *see also Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (framing constitutional right as "deadly force cannot be used when there is no longer an imminent threat of danger" is "too high a level of generality").  Therefore, "[b]ecause the inquiry into whether an officer used excessive force is highly fact-dependent, police officers are entitled to qualified immunity unless

existing precedent 'squarely governs' the specific facts at issue." *Manery*, 124 F.4th at 1081 (citation omitted).

Here, neither the facts in *Payne*, *Tennen*, and *Green*, nor the facts in the other cases plaintiff references without further discussion, "squarely govern" the specific facts at issue here, which include plaintiff's seemingly passive resistance to the first responders' and Deputy Caress's orders to step away from a rapidly, evolving fire, especially with known flammables in the vicinity. In *Payne*, the Seventh Circuit found that the defendant police officer was not entitled to qualified immunity where the plaintiff alleged that the officer lost his temper while arguing with her at the scene of her son's car accident -- even after her son had been secured in a squad car -- and then ran at her, hit his chest and stomach against her body, threatened to hit her with his balled fists, "grappled over" her arm with other officers for 30 minutes, jerked her arms and wrists, handcuffed her so tightly that she lost feeling in her hands, and did not loosen them until she arrived at the police station. 337 F.3d at 774-75. Under even less exigent circumstances in *Tennen*, plaintiff, who was loading his luggage into his friend's car in a passenger drop-off area at Midway Airport, ignored a police officer's repeated orders to move the car and park it. 1995 WL 398991, at *1. Under those circumstances, the district court found that plaintiff's "behavior constituted nothing more serious than a passive refusal to obey the defendant's order to stop putting his luggage in the trunk," and thus, objectively was "not a case where the defendant was forced to make a split-second judgment under tense and rapidly evolving grave danger." *Id*. at *4. Therefore, the court reasoned that "a reasonable officer would have believed that grasping plaintiff by the arm and shoulder, yanking him around harshly enough to lift his feet off the ground, striking him once in the back, and causing him injury was excessive in light of the fact that plaintiff . . . had neither posed a danger to the

defendant nor resisted arrest in any manner." *Id*. at 6. Finally, in *Green*, this court held qualified immunity did not apply to an officer who administered knee strike to suspect who was handcuffed, lie motionless on the ground at gunpoint, and was no longer capable of resisting. 2015 WL 5918918, at \*6.

The other cases cited by plaintiff involve a variety of similar, non-exigent circumstances, and most often involved significant applications of force on subjects who were *already subdued* on the ground or in handcuffs. *See Dockery*, 911 F.3d at 468 (Defendants *entitled to qualified immunity* where video evidence unambiguously showed plaintiff "had not submitted to the officers' authority and was far from subdued" when Taser three more times.); *Morfin*, 349 F.3d at 1005 (jury could conclude officers acted with excessive force after arguing with plaintiff about functioning of voting machines, where they grabbed him, twisted his arm, shoved him toward the wall and took him to the floor, even though he was docile and cooperative); *Clash*, 77 F.3d at 1047-48 (no qualified immunity for officer who allegedly shoved unarmed, handcuffed individual into police car during investigatory stop); *Ingram*, 1995 WL 745849, at \*11 (denying motion to dismiss based on qualified immunity where officer allegedly grabbed non-resisting plaintiff by the neck and elsewhere, lifted her in the air, handcuffed her, and dragged her to a squad car during a traffic stop when she failed to produce her driver's license). While plaintiff alleges that Deputy Blum shook him by the wrists and arms and then delivered a knee strike, it is undisputed that unlike in *Green* or the other cases plaintiff cited, he was not already on the ground and safely contained when Blum employed those maneuvers.

Most importantly, this case differs from the situations in the cases cited by plaintiff because defendants Caress and Blum faced a situation that any objective officer would view as potentially dangerous, tense, and rapidly evolving. Instead, as defendants argue, this case is

12

more akin to *Moss v. Schimp*, No. 20-cv-107, 2022 WL 1443422, at \*7-8 (S.D. Ill. May 6, 2022), in which police officers responding to the scene of a raging house fire with a nearby propane tank tackled plaintiff, who ignored or did not hear their instructions to stop while running past yellow caution tape toward the house.  Even though Moss suffered two ruptured tendons during the takedown, the court determined that a "reasonable officer could have believed Moss was attempting to run into the burning house," and if he "had gotten past the officers and into the house or even close to the house, his own life and safety," and that of the firefighters could have been in jeopardy.  *Id*. at \*8.

While plaintiff here claims that he did not receive instructions from a firefighter or law enforcement to step back until just before Caress and Blum restrained him, and understandably believes the defendants overreacted, the issue for qualified immunity is not whether plaintiff behaved unreasonably, but rather what a reasonable officer in defendants' position would objectively believe.  From that perspective, an objective officer would believe both that:  (1) plaintiff was refusing to comply with instructions to step back from the fire because he remained nearby with his hose; and (2) it would be dangerous to allow plaintiff to remain even 15 feet away from rapidly burning structures with known flammables present, including a nearby 500-pound propane tank.  Further, the dash-cam footage from Caress's squad car shows large amounts of smoke emerging from the structures and traveling the length of the entrance road.  (Dkt. #18-1.)  While plaintiff attempts to minimize the danger he faced by arguing that he was far enough away so as not to feel any heat from the fire and had successfully contained the fire to his shed and garage for some 20 minutes with the spray from his hose, again what matters is the information known to defendants at the time of the encounter, which included a firefighter's assessment that plaintiff needed to move back and plaintiff's apparent, repeated

13

refusal to heed those warnings. *See Siler*, 957 F.3d at 759. Indeed, these circumstances are precisely the context in which the Supreme Court has counseled courts to make allowances for on-the-scene decisions about the amount of force that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]" *Graham*, 490 U.S. at 396-97.

Finally, plaintiff does not argue, and the court does not find, that defendants' use of force in this case was so egregious that it was obviously unconstitutional. Instead, the Seventh Circuit has recognized that there is no clearly established rule "forbidding a clean takedown to end mild resistance." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) (officers entitled to use kick or leg sweep causing handcuffed plaintiff a compound fracture when plaintiff began shouting threats and racial taunts, refused to stay seated on the ground, and started to move away); *see also Moss*, 2022 WL 1443422, at *8 (finding same, especially where, as here, no evidence suggested defendants used any force after plaintiff was subdued on ground).

The court certainly sympathizes with plaintiff's distress over this incident, having been from his perspective violently taken down and dragged away by police officers while innocently trying to contain a fire on his own property. However, the question for qualified immunity is not decided from his perspective, but rather from the perspective of an objective officer. In this case, the deputies were presented with an individual who continued to place himself in harm's way, despite repeated warnings by a firefighter and a deputy to move back, and the real risk that an explosion could endanger them and him at any moment. Under these exigent circumstances, a reasonable officer would not have known that their removal of plaintiff from that peril, however clumsily and with an unfortunate knee strike, was objectively, beyond question, a violation of the Fourth Amendment. Thus, defendants are entitled to qualified immunity and summary judgment on plaintiff's excessive force claim.

14

## II. Unlawful Arrest

"An unlawful arrest occurs when a person is seized by police without probable cause." *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008) (citations omitted). However, the question of whether there was "probable cause to arrest [plaintiff] is separate from the question relating to qualified immunity." *Schimandle*, 114 F.4th at 654 (quoting *Fleming v. Livingston County*, 674 F.3d 874, 879 (7th Cir. 2012)). An officer is entitled to qualified immunity in a false arrest case when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Id*. at 656; *see also Payne*, 337 F.3d at 776 (citing *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (The standard "is an objective one and evaluates whether probable cause existed on the facts as they appeared to a reasonable police officer, even if the reasonable belief of that officer is ultimately found to be incorrect.").

Here, defendants argue that they had arguable probable cause to arrest plaintiff for interfering with firefighting under Wis. Stat. § 941.12(1), which makes it a felony to intentionally interfere with the lawful efforts of firefighters to extinguish a fire. While plaintiff argues that it is impossible to infer that he was interfering with firefighting activities because Hartung arrived in an ambulance, was not dressed as a firefighter, and was not extinguishing a fire, he has offered no admissible evidence in support of these contentions. To the contrary, plaintiff does not dispute that: Menomonie Fire Department personnel like Hartung are dually certified as medics and firefighters; Hartung and the other firefighter with him in the ambulance began assessing the fire as soon as they arrived at the scene; and plaintiff remained 15 feet from his burning shed and garage while attempting to control the fire with a garden

15

hose, despite knowing that flammable materials were both within the burning structures, as well as nearby in the form of a large propane tank.

More importantly, because defendants have asserted qualified immunity as a defense, plaintiff has the burden of showing that defendants are not immune by citing controlling legal authority clearly prohibiting officers from restraining an individual in handcuffs for safety reasons after that individual chooses to remain near an active fire despite repeated warnings by a firefighter to move back, whether or not the individual heard those commands or knew who was giving them. While plaintiff cites *Collins v. Virginia*, 584 U.S. 586, 595 (2018), for its holding that "officers may not enter a home to make an arrest without a warrant, even when they have probable cause," that case obviously does not begin to address either probable cause or arguable probable cause under circumstances at all similar to those in this case. Accordingly, plaintiff has wholly failed to show that his seizure under the circumstances was objectively and beyond question a violation of the Fourth Amendment, rendering defendants entitled to qualified immunity with respect to plaintiff's false arrest claim as well.

## ORDER

IT IS ORDERED that the motion for judgment filed by defendants Jake Blum and Samantha Caress (dkt. #14) is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 17th day of March, 2026.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

16